Good afternoon. I am Richard Sennett. I'm here on behalf of Mr. Ken Burns. We may ask you to be sure that the microphone is up so that Jenny Cook can hear all of us. Jason, can you hear me? No, it would be helpful to have just a bit more volume and I think Marshall can fix it. If you don't hear me, let me know. All right, thank you. Your Honor, with me today is my leader, Kelly Henry, and my co-counsel, David Fletcher. Could I have a zero-five minutes for rebuttal, please? And one minor housekeeping matter. I was talking with the state over the weekend and on Monday, it seems we both cited to the wrong copy of the trial court's order denying post-conviction relief. I'm sorry, could you repeat that? Can you say that again? Yes. We cited to the wrong copy of the order denying post-conviction relief by the trial court. It's missing four pages. The record entry is still 13922, but it has two copies of the order, and one of them is missing four pages. The correct copy is the 3895. So I just didn't want to trouble your clerks to be getting confused by that. Thank you. Now that I'm getting my argument. In this case, at the end of sentencing, which ended about 9.20 in the evening, the jury went out and deliberated until about 10.30 that night before retiring to sequestration the night. They came back the next day, and they deliberated to the majority the next day. They submitted questions during that deliberation. Can we impose consecutive life sentences? Can we impose life without parole? And finally, at the end of over eight hours of actual deliberation, I'm not counting times for recess, but actual eight hours of deliberation, they came back with a verdict of death on the one murder that the state contended that Mr. Burns had personally committed by his own hand and his own gun. And they came back with a verdict of life on the one murder that the state contended he had not personally committed. Which all of this is to say, in all that deliberation, they spent more time deliberating sentencing than Mr. Burns' trial counsel spent in preparation for sentencing. And that's the crux of every problem I'm going to talk about today. Because of that lack of preparation, the jury was fundamentally misled in two incredibly significant ways. First, as Mr. Burns' role in the offense. Prepared counsel would have been able to impeach one witness of the prior inconsistent testimony and rebut the testimony of the second witness, which would have left Mr. Burns in a posture he was at the start of the trial when the prosecution contended he was just one little wickle in the vernacular. And his moral culpability was similar to that of the man who holds Jesse James' horse outside of the bank. But because they were not prepared, Overdell's prosecutors were able to present false testimony, inconsistent testimony, which led the jury to receive a false impression of what Mr. Burns had done on that terrible day. Secondly, the jury was fundamentally misled about who Mr. Burns was. In their preparation for the midpoint of trial, they met with a few people and decided who would be best. And who they decided would be best were people who could present a single aspect of Mr. Burns' being, which is a very fundamental part of his being, it's very important to him, which is his religious faithfulness. And that's what kept the jury out, because that's all they had on his side. But that's only one small factor of who he is. And they didn't hear anything else about him. Indeed, and I'll get more into this when I talk about prejudice, they were fundamentally misled about who he was. They were misled into believing that he didn't even have a job and could get one in the future. And they were misled that he was a spoiled person who was given a house by his father. The truth of the matter was that his father had left the family, his second family, and had left Mr. Burns, his nine siblings, including a profoundly disabled older brother, and his mother to share a three-bedroom, one-bathroom house, where he was a witness to extreme paternal abuse when the father even showed up. And the jury never learned that. And I'll get more into that later. But they were misled about that. And as I said, they were misled about the fact that he didn't even have a job, when there was a vice president of Cheney's who wanted to testify on his behalf about how he wanted to open a store with Mr. Burns in Arkansas. And do you think that the error was a failure of investigation? I think it was a failure, honestly, to put in any effort. So it's a product of investigation, but it's also the product of getting to know your client. And I think it's fundamental that you should know your client works and where he works, and that they were unable to let that be known. When the post-conviction hearing, they didn't even know who Michael Hissog was, other than he was the name in the file that Kevin Burns had asked them to talk to, but they never got around to it. That's more than just not investigating. They didn't investigate, so that's the matter. But they didn't even take basic measures to understand why these people might have mattered. The 1989 ACA guidelines for performance in death penalty cases begin with how do you undertake investigation. And the rule, as I understand it, is that they suggested preparation for the sentencing phase in the form of an investigation should begin immediately upon counsel's entry into the case. And that's mentioned in several guidelines. What was done here? Your Honor, I believe that the record strongly reflects that what was done was an investigator talked to so many people, but the lawyers never knew who he talked to or what he had done. They could never explain what they had learned from him. Instead, lead counsel testified at post-conviction hearing that basically what they did was they subpoenaed a bunch of people that Mr. Burns' mother had told them about. Not Mr. Burns, but Mr. Burns' family had told them about. And those people came in the middle of trial, and I think the record reflects that they would have had a recess at about 2 p.m. on that Friday. And so these people would have been coming in that afternoon, and then they commenced the penalty phase at 4.20 p.m. that day, I believe. And so in that time period, they brought in about a dozen people to talk to them to decide who would be best. And I think that's completely obviously contrary to Rompilla, Wiggins, Williams, and those ABA guidelines, that these were people they needed to talk to and formulate a theory with well prior to trial. You know, I don't think it is just talking to people and saying, oh, you say something nice about Kevin. They needed to find people who could tell them and tell a jury who Kevin was and what he had overcome. And they simply never made that effort at all. So I guess the question becomes, was there an adequate investigation, and did the investigation inform their mitigation strategy, or did they have a balance? Did the people who showed up create their mitigation strategy? I submit it's the later. I don't see any evidence in their post-conviction testimony that they had any strategy other than lesser culpability. They did say they wanted to show that he had lesser culpability, and that was their strategy. But on that issue, in regards to deficiency, lead counsel testified that he had assigned to his co-counsel the responsibility for impeaching Eric Thomas' testimony with any prior inconsistent statements. They had the transcripts of his prior testimony. They were there, and co-counsel simply didn't do it. And lead counsel couldn't explain why, and the best that co-counsel could say was, in the heat of the battle, something gets missed. And respectfully, transcripts aren't something that gets missed. You print them out. You print multiple copies. You bring the copies to trial. It may be you don't know exactly what parts of that transcript you're going to use, but you have every bit of that witness's testimony on every material fact flagged, and you are ready. That's a matter of preparation. In the heat of battle, a competent soldier and a competent lawyer is not flailing around. They know what they should do because they were prepared before the battle, and these lawyers simply did not. In light of the 210 pages of testimony in the post-conviction hearing, what was not done that you say was absolutely necessary to be done in this trial? So there's two facets to it, and I'll focus first on the 210 pages, which that has to do with illuminating who Kevin Burns was. And the reality was Kevin Burns is a religiously faithful person, no doubt about that, and 12 pages glossed into that. But he's a young man. This happened on his 22nd birthday, who had a record of achievement that actually was inconsistent with his upbringing. He is living in a home with nine siblings, one of whom is profoundly disabled, a mother who has to spend her time caring for other people's children so she has money to support her family. Other siblings are having to care for his older brother. He is actually acting as the man of the house, and in all of this he doesn't drop out of school, but he perseveres. One of the reasons he also has to act as the man of the house is the ostensible man of the house, his father, rarely is there. When he is there, he's drunk. He shows up at one in the morning. He's physically abusive. He demands to see his children. And one of the most indelible impressions he makes on his whole family is when he puts their mother in the hospital for three weeks by breaking her jaw, which... The opposing counsel argues in the briefing that the children would not know that that occurred. How can that be so? I think that's a counterfactual possibility. I don't think the children would not notice that their mother was gone for three weeks in the hospital, and I cannot fathom it that they wouldn't notice when she came back with the jaw brace or whatever. Certainly the testimony is that his other siblings were scared to call father. When they needed money, they would draw lots, so to speak, as to who would make the call because of the danger of physical abuse from him. And so all of that is to say that this young man had overcome, and there was a reason to believe he could do better. And Michael Hisong, this vice president from Shoney's, and I think we have to talk about what Shoney's is in the 90s. It's a fundamental institution in Tennessee. Everyone on a Sunday afternoon is either at a Cracker Barrel or at a Shoney's. And so having this vice president come in to speak about what a good man Kevin Burns is, about how he was somebody he wanted to open a new store for, and on the different issue, how his hair was no longer than mine, which I'll get to in a second, to not hear that was so fundamental. And where that goes is where I'm about to go, is the character that Kevin Burns displayed in overcoming establishes that our argument that he is not the sort of person who would be the man firing all these shots into the car is even more strongly supported. Your claim is not that he didn't fire the shots. My claim is he did not fire a single shot into the car, that the man who fired the shots, all of the shots, that killed Damon Dawson and hit Eric Thomas, is Derek Guerin, a six-foot, four-inch man, described as the big fellow in glasses at Guerin's trial. And my contention is that Mary Jones identified someone as a gunman shooting into the car who had a long jerry curl, which could describe almost any of the other gentlemen at the scene, except for Kevin Burns. He was the only one with hair like my own that simply cannot be worn in a jerry curl. So the proof that was before the court, Your Honour, which it doesn't matter whether I agree with it or not, but the proof that they heard about Mr Burns' role was his statement that prior to the robbery, prior to any robbery taking place, he fired shots at this man, Tommy Blackman, or in the direction of Tommy Blackman, who was fleeing. That's an awful thing to do, okay? I'm not minimizing it. And that put other people at risk. But his testimony, not his testimony, his statement to the FBI, the FBI agent who said he had short hair, was that that was his role, and then he left the scene. He wasn't there for the robbery. He wasn't there for all of the shooting. So essentially are you arguing that a residual doubt theory here? I think that's a way to characterize it, but I don't think it's... What's the best case that supports the existability of that as a sentencing case? I think the best cases use the term lesser culpability, and that is... No, it doesn't sound like you're talking lesser culpability. It sounds like you're saying he didn't do it. Well, Your Honor, I think that this is something that legally is disputable, but it is a status we're in. Under criminal culpability theory for felony murder, he could have been found guilty based on what he said he did. And I can get with you why, as an advocate, I would argue against it. But suffice it to say, you can be guilty of felony murder if you're with another actual and don't kill anyone, as long as you're a participant. And that is what the Court of Criminal Appeals found. They found... This is what I think they... If I may, I want to read this, if I can, because I think this is the thing that's contrary to criminal status law is addressing what Your Honor is asking about. They held, regarding the penalty phase, the proof established under the testimony of Thomas and Jones... PHONE RINGS Step up, Your Honors. PHONE RINGS We can get Judge Cook back on the line. PHONE RINGS Yes. Judge Cook? Yes, I'm here now. Oh, thank you. Can you hear me here? PHONE RINGS He couldn't hear me. Go ahead, please. Thank you. I'm going to start over with that to make sure it's all in order. Judge Cook can hear what I say. They ruled, regarding the penalty phase, the proof established under the testimony of Thomas that may have previously identified Derek Garrett as the man shooting in the driver's side. And Jones, that's the woman who said the gunman that she saw had this long jerry curl. The petitioner shot into the vehicle, creating a great risk of death. That's an aggravating factor under Tennessee law. According to the petitioner's FBI statement, he shot at Blackmon, admitting that three children were in his line of fire. This statement also supports an application of the factor of creating great risk of death to two rural persons. Under either theory, whether he is the man firing seven shots from a .32 automatic into the car, hitting Eric Thomas three times and Derek Garrett over and over and killing him, under that theory, or under the theory that he just fired shots in the direction of a fleeing man, the aggravating circumstance is still established. The petitioner cannot establish that his sentence would have been different. They imposed a negation requirement. I believe that this is specifically contrary to Williams v. Taylor, which held the omitted mediation evidence does not need to undermine or rebut the prosecution's death eligibility case. So, yes, under Tennessee law, he was eligible for the death sentence if he fired this gun during this felon's robbery in the direction of someone else and hit no one, but there were three, two, or four people in danger. That makes the aggravating factor five. And arguably, and what will accept the purposes of IAC sentencing, that also makes him guilty of felony murder. Okay? That negation requirement, I believe, is also contrary to clearly established law by Taylor v. Williams, where they hold that the correct reasonable probability standard is whether the mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of the defendant's moral culpability. And it's really that term they used in those three cases, moral culpability, that I think is so essential. The negation requirement imposed by the Court of Criminal Appeals didn't examine these two different roles on a moral culpability level. They involved, or they engaged themselves with them as to whether they established an aggravating factor. I might say that that's the same as saying that an aggravating factor that looks at prior criminal history, and you could say, well, this man has a prior criminal history of two auto thefts, and this man has a prior criminal history of two first-degree murders, but they're both prior criminal histories, so they're the same thing. They simply aren't. They're different levels of moral culpability. And I think that's what the United States Supreme Court has clearly established over and over. And I do want to tie that together, if I may, because I know I can't get relief from this Court unless I can pass through the gateway of D1 or D2. And as to that portion, the Court of Criminal Appeals bifurcated their IAC sentencing analysis in two parts, and their part on lesser culpability, I think that that ruling that I just read is the fundamental ruling that is contrary to clearly established law that permits review under D1. As to the 210 pages of mitigation that the jury didn't hear, I think the fundamental ruling that they got wrong that's contrary to clearly established law is this. They held that that 210 pages of proof did not offer any explanation as to why Mr. Burns had committed the crime. And I believe that that's contrary to clearly established law, dating at least back to Eddings v. Oklahoma, but most explicitly Smith v. Texas, which had been decided the year before by the United States Supreme Court, where they had rejected an identical nexus requirement by the Texas courts, where the Texas system had said, Petitioner offered no evidence of any line or nexus between his troubled childhood or his limited mental abilities and this capital murder. And they said Texas was in error for imposing such a nexus requirement. Indeed, Brown v. Payden, Skipper v. South Carolina, and, of course, all the way back to Eddings v. Oklahoma, make clear that evidence entirely unrelated to why the crime happened. And indeed, evidence that's developed after the crime itself, such as remorse and post-crime rehabilitation, may be considered. There is simply no requirement. In fact, there's the exact opposite. Clearly established U.S. Supreme Court law makes clear that mitigation is anything and it does not need to have a nexus. If it can inspire leniency, it must be considered. And that nexus requirement is contrary to clearly established law. And so, Judge Strange, I think I may have wandered off from your question a bit ago about what they didn't hear about that was so fundamental. And maybe I didn't. I feel like I've said some of this. But just to tighten it up a little bit, they heard one aspect of him, which was religious faithfulness. But they had no idea whether this was a religious faithfulness of somebody who has a spoiled life, that everything's come easy and he can thank God for all the blessings he's had, or of somebody who has overcome. And it was clearly the later. This man, growing up in what I think is fairly extreme poverty, three bedrooms and one bathroom for ten residents, one of whom is profoundly disabled. Profoundly disabled. They are all living together. They're living together under the threat of paternal abuse at any given moment. They are living with a mother who simply cannot be there for them. And he overcomes all of that to become a very good person that the jury simply didn't hear about either. They knew he prayed when he was ten. One witness said he prayed when he was ten, and the other faithfulness witnesses said he prayed in jail. And a brother did say that they went to church together. But they never heard again from Michael Hisong about who he was today. Somebody who worked his way up from the dishroom so that when Mr. Hisong, the vice president of Shoney's, wanted to open a new restaurant, he was who he wanted to come with him. And I submit that this is different in strength and in subject matter from what the jury heard. Okay? The jury heard merely religious faith, what they should have heard. Did you have a question, Judge Cook? My question is, can you meet the Supreme Court test on whether or not the absence of that evidence could be reasonably expected to change the decision of the jury? Your Honor, I think I can. And Tennessee, like Maryland, is a one-juror nation state. I'll just say that TCA 3913-204H is a statute that was in effect at the time and is in effect today that makes a single juror have the ability to impose life if they refuse to agree to a death sentence. And State v. Grimmer 876 Southwest 2nd 75 is a Tennessee Supreme Court case that just makes that explicit for the record. But with that being the background, the standard is set forth for Wiggins v. Smith for prejudice at the penalty phase. And Wiggins v. Smith makes clear that it's a reasonable probability that at least one juror would have struck a different balance. And I submit that there is more than a reasonable probability that at least one juror would have struck a different balance. And I don't rest on this, but I think it's illuminating how this jury agonized for so much time, more time than the penalty phase. In the penalty phase, it looks like it was four hours, and most of that was arguments between lawyers. You've only got 12 pages of witness transcript on the defense. So they agonized for all this time. They're asking, can we impose consecutive lives? Can we life without parole? So I think that illuminates the significance that this testimony would have had. The test is so stringent, Counsel, in as much as we have to find that the absence of evidence, the deficient performance here, the failing to portray this defendant, this young man as so severely deprived and poverty-stricken, that it deprived him of a fair trial and caused, as you know, called in question the reliability of the outcome. Your Honor, I think that very often you are confronted with a situation where somebody's done a horrific and barbaric murder and their role in it is indisputable. Here we really have two components. I said it quite strongly. His role is not indisputable. He did not fire a shot into the side of the car, period. That did not happen. But for the sake of argument, there at the very least is a reasonable probability that multiple jurors would have had a significant doubt about his role in the offense if that impeachment and rebuttal had taken place. So that's one component of it. So we have to take it as a start that there's a significant doubt about his moral culpability, his role in the offense. And then we have to break into this history that would give a jury confidence that this was a man they could believe in. And like I say, I think they come together. Is there anything in that history that had there been a lot more of this evidence that was presented might have not been very helpful to him? Really, I don't believe so, Your Honor. I cannot recite his minor criminal history which arguably maybe a door could have opened. But it was not, it wasn't what you normally see. Nothing that a attorney would be all that fearful about. There was no violence. No violence at all. He just simply didn't have a history of violence. And instead, he had faked off against violence without, at record clips I believe, ever reacting violently. You know, he took care of his family. He had to step in because they couldn't depend on his father. But there's, I don't believe, anything that suggests that he ever acted out violently in his life. So it is different, like I say, from so many of those stories where you hear about a horribly, mentally damned human being. That's not the case of Mr. Barclay. He's the kind of guy that the jury, when they're trying to decide, well, I think it's an easy question, but when they're trying to decide, do we believe that he's the guy who fired all these shots, or do we believe that was Derrick Garrett? And they listen to all these people who talk about what a great guy he is. I think that makes it even more likely that the jury says, we don't buy it that he's the guy who would be leaning in the window. We know Eric Thomas said he was a big fellow with glasses. We know he said that. And I know what you're gonna be- Well, you'll have a few more minutes because we've borrowed some for the telephone call, but would you address the inconsistencies, the Thomas testimony inconsistencies or false testimony? Yes, Your Honor. So, to get through it there, I believe my- I can argue that for inconsistent theories, the clearly established law of Berger versus U.S., the prosecution shall not strike foul of Lowe's, and obviously for false testimony, it's Augers and Giglio. But I'm more focused on D2 because I think that the Court of Criminal Appeals decision was counterfactual. They simply rejected the evidence of falsity and inconsistent statements that are set forth in the brief. And I can- I want to highlight something that I think is important, which was- it wasn't ever a dispute. In the appellate brief, which is record entry 13975 by the State of Tennessee at page ID 7057, this is before the Court of Criminal Appeals rule, they said, it is undisputed that Mr. Thomas' testimony about who shot him is inconsistent. And, indeed, I respected their adherence to that principle throughout this litigation, responding to our motion for summary judgment. This is record 91, page ID 1257. They wrote, while no good reason is forthcoming for counsel's failure to teach Eric Thomas with his prior testimony that Derek Guerin was the person who shot him, the prejudice of such failure is never established. And then, in record 94, page ID 1273, they wrote, in the trial of Derek Guerin, previous to Petitioner's trial, Thomas identified Guerin as the one who shot him and Dawson. So, I mean, this has been abundantly clear to everyone, and I believe parsing through the brief doesn't take much. Parsing made it clear that it was in the post-conviction brief as well. So, I think that gets us through D2. So, that gets us through false testimony analysis under Otters and Giglio. And I submit that there's no way anyone can possibly know that Mr. Thomas has testified in a manner that is materially and impossibly irreconcilable with what he did before, which is to say, it's a lie. Okay, so back up a minute. Who were the victims as to whom his actual felony murder convictions were recorded? That is an excellent question. I know it is. I know. I asked it. Yes. So, this is what happens, I believe, at Mr. Guerin's trial. Mr. Thomas testified that it was, Absolutely true. Multiple other witnesses, and I'm just doing an additional conclusion here, multiple other witnesses did testify that Derek Guerin did have to do that. That's absolutely true. And I don't know if that's true or if he did in that case, but there was an argument that he does know the passenger side of the case. Or, according to Eric Thomas, the gunman on the driver's side. And that's what I'm not trying to keep. My position is the inconsistency is not that there were other witnesses who moved into the other side. The inconsistency is they relied on Eric Thomas at both trials. And at trial number one, Eric Thomas had the passenger on his driver's side firing every last shot. He was the only person Eric Thomas saw firing. He was the only person he saw hitting Damon Dawson. He knew he hit Damon Dawson over and over. He watched him do it. So that is what is inconsistent. And that is what I suggest is false. I don't see how that truth can be consistent with what is then presented at this later trial, which moves Burns into that exact same position. They simply can't be standing in the same place with the same gun at the same time. And it must be clear, that car is filled with shell casings from the same gun. The first you order that is firing over and over and over. This isn't a situation where not even anybody would suggest it. There's not a witness who's saying there's two gunmen on the driver's side. But there's not even a suggestion that there's some other gunman who could have done it. So that's where I go with that. And I think the law under D.Cleo and others is clear that it is the reasonable likelihood that a false testimony could have affected the judgment of the jury, which I think is clearly a lower standard than the circular prejudice, and a more easily met standard. I don't even mean circular prejudice. I really do believe IAC in sentencing is positive of the sentencing issue. But this lesser standard is clearly met for all the reasons I set forth already. You know, this jury, if they hear that Eric Thomas has previously identified another man, with all the diagnosing they're doing, it's a reasonable likelihood they would have been affected. So I believe that is met. And that's... Oh. Your red light is on, let me guess. Judge Cook, do you have any further questions? No, thank you. No, thank you. Once you make your last statement, then you'll have your rebuttal, huh? Okay. In terms of inconsistent theories, I think that we get through D.Cleo, which gets us to De Novo Overview. Obviously, key pressure activity would apply to any new law, but I don't think there is any new law. Instead, the law that would apply to inconsistent theories was summarized by this court, and I say summarized, in 2013 in Stumpy Bradshaw, when this court examined the pre-existing law in inconsistent theories. And look, it snippetly grooves from the 8th Circuit in 2000, Thomas Smith v. Calderon from 1997 to the 9th Circuit, and Anne Ray's Separatist from California in 2005, and used those to enunciate what was the principle. And the principle was that it would be a violation of due process if... There were other things, but these are the two that matter here. The prosecution offered different and contradictory testimony from the same witness without acknowledging the contradiction. And that's the biggest thing I'm pointing out to happen here. They clearly introduced contradictory testimony from Eric Thomas, and they didn't acknowledge the contradiction. And then secondly, they obeyed evidence of another's guilt. Again, I say that to Derek Guerin from the presentation. So, with that... Thank you. Thank you. Let's take a moment to get... to reconnect, I think, to Judge Cook before the state address. Yes, Marshall. Thank you. Judge Cook, can you hear now? Yes. It should be better here. Thank you very much. Mr. Feingolder for Maggie's report. May it please the Court, Your Honors. Nick Feingold from the State of Tennessee and the Board of Respondents. I'll address the claims in the order that opposing counsel addressed them. We'll start by saying the district court correctly rejected the claim that counsel was ineffective at sentencing because the state court's rejection of that claim was not so lacking in justification that there was error beyond any fair... any possibility for fair-minded disagreement. And that is the standard that applies to this claim. It's not just asking this court to review the claim under the district court standard. Adept efforts have to apply to this claim. So, we submit that the state court reasonably rejected petitioner's ineffective assistance of sentencing counsel claim based on counsel's reasonable and considerable investigation efforts, the significant impediments that they faced during those investigation efforts, and the sound litigation strategies that they pursued despite those investigation efforts. Counsel, the problems they faced with the defendant's mother and her interference with their investigation, that's not an excuse here, is it? I totally agree, Your Honor. It's not an excuse. Had counsel sort of rested on her haunches and said, oh, counsel's mother did an obstruction and not done anything, I agree that it would be problematic. But that's not what they did here. They interviewed the parents. They had an investigator. They made efforts to interview other people all before trial. And the people that they interviewed, they got some information from some of them. Many of them just weren't willing to come forward and get involved in the petitioner's case. So, they did make efforts before trial beyond the petitioner's parents. They just didn't find anything fruitful to sort of create this theme of overcoming adversity. So, they decided to go with the theme of portraying the petitioner in a positive light and portraying that his role in these offenses is essentially getting out of character for him. I'm struggling. Does the record help us know whether or not Mr. Burns pointed them toward his employer, for example? The question is, did Mr. Burns point them towards his employer? That's right. Is there anything in the record that would tell us that? I know there's a reference in the record. I just viewed it 30 minutes ago or so. Counsel was aware of this Mr. Hitson. I'm not sure what I'm saying. Was aware of this Mr. Hitson who was the petitioner's boss at Shoney's. It was unclear to me in the record why they opted to not call Mr. Hitson. Your understanding that Mr. Burns provided that information? I believe that's correct. I know regardless, they knew of that name. It was in the file. It was in the file. They were aware of it. Never contacted him. I don't believe they ever contacted him. But what I would respond to that is, I think the question was, were they sort of constitutionally compelled to contact Mr. Hitson? Had the petitioner said, this is my employer, I have a great record with him. Are they constitutionally compelled to call him when they provided other evidence during the sentencing phase to establish that the petitioner had an excellent work record? And what was that other evidence? His brother saying, we've worked several jobs together. We did a good job and we could be renowned. Exactly, that's it. Isn't that not emphatically different from calling a vice president of Shoney's Corporation who had expressed a willingness to come and tell the trial peers, the jurors, that he respects this young man, that he has done a good job, and that he has asked him to consider opening a Shoney's at another location? Sure, and I think that counsel received specific, even if the petitioner told him that this was his boss, had he received specific information from the petitioner that this is the sort of testimony that this witness would have been willing to come forward and give, and I think that might be different, but that's not what we have here. You don't have anything in the record other than the fact that Burns asked them to contact this boss. So whose job is it to figure out what this boss knows? It's counsel's job, right? I agree. But again, we have to get back to sort of the efficiency and prejudice problem. Is it reasonable to say that there's a reasonable probability that had they called an employer who might have been willing to rehire or go into business with a petitioner, that that would have made a difference in the outcome of their sentencing determination? That's the question, isn't it? I'm concerned about both the quality and the quantity of the investigation. I think we've already talked about the 1989 APA guidelines. There's no question that the requirement of those guidelines is that they have to begin immediately upon employment to do an investigation. And doesn't the record reflect here that they did hire an investigator who spoke to people, and when quizzed about it, they could not tell you who, they could not tell you what the people had said to them. The only people they physically saw and met with before trial was Mr. Burns' parents. One time before trial, the two parents. I'm struggling with how that... I think it's a matter of... ...monster as investigators. Who they were calling were the people that provided useful information and provided useful information in terms of a mitigation theory. And the mitigation theory that they sought to establish was, again, to paint a petitioner in a problem like this in this context. When did you decide to do that theory? I understood that what they said to the court, when the court said, what mitigation weaknesses do you have, how much time do you need? I didn't even know the answer to that question. The trial was eight years ago, Your Honor. How could... I think the question would be, what have they shown in that testimony that would show that they undertook any investigation upon being employed into mitigation, which these guidelines say is from the get-go, the requirement, both as to guilt and as to mitigation. And I think the evidence for that is the fact that they had this investigator in the fore-trial there making adverse health. As far as what we can pinpoint, the second after they were appointed, they went back to the office and started working on getting an investigator. I don't know that we have that on the record. If anybody's asking that, I think we're looking at the entirety of what they had done and seeing if, under the standards that govern that, if that had been what one would call an adequate investigation. Our law is very clear. You can make a decision about how you are going to do mitigation, but you may not make it until you have done adequate investigation so that your decision is fully informed. What can you tell me to show that there was any fully informed decision made regarding the presentation of mitigation evidence? Again, we go back to the proof that they had this investigator before trial. They're interviewing the parents and utilizing the investigator and even calling themselves witnesses that they're seeking to have either active mitigation through the third development or have them... It was not in the middle of trial. It was not in the middle of trial, Your Honor. There was a testimony from the both attorneys that they never met with anybody but the two parents before trial. The investigator was the one in charge of speaking to people They spoke to people before trial. There was testimony. He was not sure whether they met with people in their office before trial or called them, but counsel also said that either one or both of them spoke to witnesses before trial as well. There were pre-trial investigation efforts from both counsel and the investigator to develop this mitigation theme. And it's important to realize the mother in this case, the evidence that they got from the petitioner, it makes sense. Who are you going to go to first to get information about the petitioner? They went to the petitioner's mother and father and said, tell me about the petitioner. The information that they got from the mother and father was that, you know, essentially that he had a normal childhood with no problems. So, after that... Let me help... Help me understand. The first time they actually met with his parents was a couple of days before trial. I don't recall specifically when it was. I don't know if it was... I think those witnesses testified that they did not meet with counsel until a very shortly point. My understanding is that the petitioner's parents were very involved in this case in terms of negotiations and advising the petitioner and counsel speaking with the petitioner's parents about strategy. That's my understanding. That's the offer. In fact, that they were involved in this case and that counsel had a relationship with the petitioner's parents early on because of their involvement in their sort of relationship with the petitioner in terms of advising what he should do in this case and the strategies he should pursue. So, I don't think it's important that they just spoke with the petitioner's parents for the first time a few days before trial. But the information they got from the parents is that there was a normal childhood with no problems. Then they do make efforts themselves and through the investigators go out and interview people from West Memphis where they speak with them on the phone and see what else there is out there to either contradict the communication theories that they have from the parents or add to it in some way. And what the petitioner's counsel's testimony was at the post-conviction hearing is that when they made those efforts to go out and talk to people that the petitioner's mother was largely in control of who would or wouldn't talk to them in the community. And again, they didn't just rest on that. They didn't say, oh, the petitioner's mother is being difficult. She's having people not talk to her. They still contacted people and said, hey, what do you know about the petitioner? What can you tell us that might be helpful? Where in the record is that contact? Is that when they asked them to come in and testify? It was. This was not. It's not something that happened during the trial. This is all pre-trial. The investigator contacted several witnesses before trial. The investigator. I believe it was the investigator. I think Tom Closs testified. He may have called some people on the phone or may even have people in his office. But they said that basically those people were unwilling to come forward and help the petitioner or testify on his behalf. So they were unable to find, as a result of the mother sort of, you know, putting blockade in the road, they were unable to find any witnesses to either sort of add to this mitigation theory or also add to it, because they found other mitigation witnesses to add to that theory. They were unable to find any witnesses to sort of contradict that or develop a theme of adversity in the petitioner before various post-conviction proceedings. And they were successful, you know, in portraying the petitioner in a positive light. The petitioner. They did not, which your cousin counsel argues, is that they failed to show, with any reasonable clarity, the problems in the home. To say that he had a place to live is a very different thing from saying he was the hidden family of a reverend who lived with his legal wife and his legal children and kept up these other children. And I think it was, like, eight residences in 12 years. Then they finally get a home and there were 10 of them. And doesn't the evidence show that he and his siblings were so afraid of this father that when they needed something, they grew strong to see who would actually call him to get the assistance that they needed. The petitioner characterized this as abuse by his father. That's not the way I saw it. My review of the record is that there was allegations of corporal punishment against the siblings. There's no allegation that the petitioner was ever the subject of corporal punishment. And we just submitted that that being a diversity is not particularly compelling when it comes down to a person who walks up to a car, fires multiple shots at a man running away, fires multiple shots in the car, and ends up killing a few people and injuring four, that that sort of testimony is not the sort of testimony that would sway the balance of whether the jury would... Our thing with that argument, Counselor, is that all of these death penalty cases have terrible facts. And what is asked to show to the jury to consider are the facts of someone's life and the things that impacted them. Is it going to be enough to say, you know, I knew the day before my wife's birthday that my father who lived elsewhere came and beat my mother up. She had to go to the hospital and was out for three weeks. Is that enough to say, oh, it's okay to go harm someone else? No, of course it's not. But does that inform the moral culpability, which is the question that every juror has to ask? There's a lot of assumption in that question. For example, what was brought up earlier is the idea that he knew that this incident was solved by the petitioner's father. How can a child living in a parental home have a mother go to the hospital for three weeks and come home with a jaw brace? We don't know. We do not know. It's perfectly reasonable that the mother was protective of the petitioner and never told him what happened. Jaw brace? She may have told him that he was completely ignorant of that. The record just doesn't speak to that. If the petitioner doesn't... ...counselor, wasn't that what the jury needed to hear? And then the jury could decide whether they thought the mother hid it from her children or whether they thought that was what this gentleman lived with. The problem is, when counsel sought out information about the petitioner's family situation, he went to the petitioner's parents and they painted the rosy portrait of his background.  When they went to other witnesses to try to interview other family members and other people in the community to either confirm or dispel that idea, they were unwilling to speak to counsel or investigator because the petitioner's mother didn't want them to. I don't know the reason for that. Maybe they didn't want to sort of have a ruined family image of what the petitioner's upbringing was like, but that was the situation counsel faced. And under Strickland, that's how we have to review counsel's performance. Under the situation... How do we review counselor's performance in items such as he gives him a new employer and counselor doesn't call the employer? Information that he hates from college. Information that he had high school teachers who were willing to come and testify on his behalf that he was a bright young man with some potential and interest in education. Aren't those just the... Aren't those just the raw facts of somebody's life that a jury would have to hear? True. But what we have in the record... I didn't hear it here. What we have in the record is trial counsel making an effort to contact some of these people in the community and an unwillingness of those people to come forward and testify. Well, the... Johnny Scott said, I was prepared to come forward, nobody called me. The school teacher said, I was prepared to come, nobody called me. There are... The job is that of counsel and I'm struggling with the answer that the mother didn't bring all these people to us and so we didn't have them so that... But again, even these people that were not called were an attorney's employee and the teacher, these are people who have testified at points that were largely cumulative to what counsel put on in litigation, which is from the teacher's mother that he graduated from high school, presented no disciplinary problems, from the petitioner's brother that he had an excellent work history, that he could get rehired at any of the jobs he worked previously. So those particular witnesses that you pointed out only could have brought forward testimonies that was cumulative to what counsel put on. I'm struggling with the concept that mitigation information is merely cumulative. If you want a jury to assess someone's moral culpability, which is their job, then don't you need a whole variety of people from your life to back up the same story? The mother has gotten up and said everything on the stand and that's all. But it's not the same if the mother says it and then the reverend from the church says it and then the school teacher says it and then the employer says it and then the siblings say it. All of those things show you something about this individual that it's merely cumulative just in no stretch of direction. It's a matter of quantity, Your Honor, because some of those things that you pointed out there, they did bring forward. They didn't just put on a petition for his mother and father to thank the same rosy portrait that they did during interviews. They brought their mother and father and they testified that he graduated from high school and that he had disciplinary problems. How many hours of mitigation testimony were there? I don't know how many hours, Your Honor. There were? I don't know how many hours. There were. I only have the transcript, so I don't know how many hours. The transcript is 14 pages. Okay. And the mitigation proof that went on in the post-conviction hearing is 210 pages. The question under the APA guidelines is have you collected enough information to make a fully informed decision and select a mitigation strategy that you will then put on? And it seems to me you have these attorneys standing before the court and conceding that they don't even know who's coming to give mitigation testimony. How can that be a plan or strategy if they can't even tell the court that they know how long it's going to take them to put on mitigation? All I can say is I think they put on a fair procession of people not just human petitioners, family petitioners. Some of this will feature people who knew a petitioner while he was incarcerated. They did some people in the middle of trial. That doesn't mean they didn't know who they were going to call. It's not interesting for the first time, but they did talk to those people just before the mitigation phase to get more familiar with what they were going to talk about. Well, we know they hadn't talked to them before. Well... We know because the attorneys testified that they had not and that the people who actually testified had said that no one had prepared them. No one had talked to them. The mother, no one talked to to say to her, here is our theory and strategy for mitigation. Here is what we want to do and here is what I need to know that you will explain. I'm struggling with how there can be a strategy at all when what you do is you take the 12 who show up, you choose six of them and you've not prepared any of them and you just send them up and put them on the stand. I don't... Again, they want the thing that they got from Petitioner's parents which is that he had a good upbringing, he graduated from high school, he attended church regularly, he had a good work background. That's the thing they want with those little witnesses that they provided to support that thing and we submit that that was entirely reasonable based on the independent technical case. I'm happy to answer any other questions in court. Please go forward with the strict repression of standard. My understanding of the Court of Criminal Appeals was that it misstated the standard. No, it misapplied. It did at one point correctly state it but in its application what it came down to was the whole thing that he had to establish that his sentence would have been different and I'm sure you would agree with me if that's not the law. Correct. The problem is we still get it on the prejudice standard because in the central portion of the opinion the appellate court correctly stated the strict repression standard. It stated the petitioner must satisfy the prejudice problem of the strict repression test by demonstrating there's a reasonable probability that but for accountable unprofessional errors the result of the proceeding would have been different. That's exactly what the state appellate court said. That's a direct restatement of the strict repression problem. And so now the question becomes they had stated at one point in the opinion the correct standard but day one requires them to apply it. I do not see in that opinion where they applied that correct standard. I think what the petitioner relies on is sort of the abbreviated version of that standard that they stated at the end of their conclusion during their application of the standard. If the court were to consider the Kleiner decision that we cite in our brief it was a very similar situation in that case in the central portion of the court's criminal appeals Kleiner decision the court restated the correct standard and then gave an abbreviated the result would have been different. The problem that why Kleiner is distinct is because Kleiner in the middle portion in which they stated it correctly was where the application occurred. It occurred at that spot. So at the end when they summarized it's no harm, no foul. The problem here is if they stated the applicable provision correctly one time in the middle and then they failed to apply them and they drew a conclusion that was incorrect. My theory of Kleiner is exactly the same as this case as far as I'll refer to it as boilerplate. There is a boilerplate log of section in the court's opinion both in Kleiner and in this case is where they restated the correct circling prejudice standard. It was at the conclusion of the analysis section where the court gave the abbreviated result would have been different language. We said the case on all fours was correctly defined. The exact same portions of the opinion were the abbreviated versus the full version of the circling prejudice standard was provided and based on that we submit that the court did apply the correct circling prejudice standard on this case. It's fine. You said that the language is actually applied. We'll look at it. That's our position, Your Honor. I'll move on to the next issue and then I'd love to go to further questions. Our next issue is the court has no jurisdiction to review positions that are outside of the scope of issues certified before this court. Aren't those issues both related to guilt and to mediation? We submit that they're not, Your Honor. We have concerns     as a guilt-based claim that's outside of the scope of issues certified before this court. We submit that the court has no jurisdiction to review positions that are outside of the scope of issues  before this court.     We submit that they're not, Your Honor. We have concerns as a guilt-based claim that's outside  of issues certified before this court. Aren't those issues both related to guilt and to mediation? We submit that the court has no jurisdiction to review positions certified before this court. We've never presented that case without a mediation because we're trying to disquite the statute. We've never presented that to disquite the statute.  never disquite the statute. We've  presented disquite the statute. We've            the statute. We've never  trying  disquote the or   the room yeah or or or or computi ok ok him e okay and bore at on or will okay or or work Ooo alright   go okay head    or okay if head child child child yout you child that outward you certainly utterly obligating case and within a very cont aud im out